[Crim. No. 2025. In Bank.—May 3, 1917.]

THE PEOPLE, Respondent, v. DAVE LOGAN, Appellant.

CRIMINAL LAW—MANSLAUGHTER—CRIMES ACT OF 1850.—Section 23 of the Crimes and Punishment Act of 1850 (Stats. 1850, p. 229), defining the circumstances that would reduce an unlawful killing from murder to manslaughter, ceased to be the law in this state by failure to re-enact it in the Penal Code.

ID.—INSTRUCTIONS—KILLING IN HEAT OF PASSION—QUESTION FOR JURY.—In the present condition of our law it is left to the jurors to say whether or not the facts and circumstances in evidence are sufficient to lead them to believe that the defendant did, or to create a reasonable doubt in their minds as to whether or not he did, commit his offense under a heat of passion; and an instruction which defines the nature of the passion itself and limits the exciting cause to a serious injury, or attempted injury, to the person of the defendant, is erroneous.

ID.—EVIDENCE TENDING TO SHOW MANSLAUGHTER.—The evidence in this case is held to entitle the defendant to a correct instruction on the law reducing an unlawful killing to manslaughter.

APPEAL from a judgment of the Superior Court of Alameda County, and from an order refusing a new trial. William S. Wells, Judge.

The facts are stated in the opinion of the court.

Frank J. Murphy, Charles N. Douglas, A. L. Frick, and Oscar Hudson, for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

HENSHAW, J.—The defendant, charged with the crime of murder, was convicted of murder in the second degree and

sentenced to life imprisonment. Upon his appeal, first heard by the district court of appeal, it was urgently insisted that the trial court erred to his injury in an instruction which it gave on the crime of manslaughter. The district court of appeal upheld the conviction, and a petition for hearing before this court was asked upon the ground that the district court of appeal had mistaken the argument of appellant against the legality of the instruction. For a further consideration of this question a hearing here was ordered.

It is not questioned but that instructions defining the crime of manslaughter under the facts developed at the trial were proper to be given. The importance to the defendant of accurate instructions becomes manifest from the following brief statement of facts. This statement is not, of course, to be regarded as containing any view of this court upon the weight to be given to the defendant's evidence. It is simply a statement of the evidence which defendant himself and his witnesses offered, both to exculpate him and to lessen the degree of the crime from that charged. The parties and the principal witnesses were colored people. Mabel Jones, a colored prostitute, had formerly been the intimate of the deceased, John Brooks. He was her "lover," her "man." During his absence from the city of San Francisco she transferred her favors to the defendant, who lived with her. She and defendant had retired for the night together, when Brooks knocked at her door in the house of prostitution where she was living and demanded admission. He threatened to kick the door in and to shoot them through it if the door was not opened. The defendant then arose from the bed in his nightclothes and, unarmed, opened the door. Brooks entered the room with a pistol in his hand and demanded that the woman leave the room and talk with him, and threatened to shoot her as she lay in the bed if she did not do so. Logan protested, and Brooks turned on him and beat him to the ground with the pistol which he held in his hand, then jumped on him and beat him over the head. The house was aroused, the police were sent for, and Brooks fled. This was the origin of the ill feeling between the men. After this encounter threats of Brooks were brought both to the knowledge of Logan and of the Jones woman, he declaring that he would kill them both. In fear of this, defendant went armed. Brooks was physically much the superior of Logan. On the night of their

fatal encounter Logan entered a resort of the colored people
—part saloon, part café—in which, for the entertainment of
the guests, there was a piano.  He was about to go to San
Diego and had purchased a ticket for that purpose.  He went
to the resort to meet a friend, not knowing that Brooks was in
the place.  In fact, however, it appears that Brooks was
under employment there as pianist and entertainer.  Logan
walked back through the bar and into the restaurant or café
where the piano was situated to procure something to eat.  It
was quite usual in that place for the guests to walk back
toward the kitchen and give their orders directly to the cook,
and this Logan proceeded to do, still unconscious that Brooks,
who was seated at the piano, was in the room.  In so walking
toward the kitchen his course led him behind Brooks seated
at the piano.  The distance between the two men was very
short.  As he passed, Brooks swung around on the piano stool
and arose to his feet, saying, ''What the hell are you standing
behind me for?  Why don't you go on and sit down?''
Brooks had one or both hands in his pocket.  He sprang
toward the defendant, who jumped back, drew his pistol and
began to fire.  The deceased, the much more powerful man,
forced him to the ground, and he continued to fire while the
deceased was on top of him and beating him.  One or more of
these shots proved fatal, Brooks collapsed, and Logan fled,
afterward surrendering himself to the officers of the law.
Under its evidence the prosecution attempted to show that
the defendant, harboring a spirit of murderous revenge for
the injuries, real or fancied, which Brooks had inflicted upon
him, sought him out in the café, stood behind him until
Brooks' attention was directed to him; Brooks then rose to his
feet and asked the defendant why he was thus standing be-
hind him, to which the defendant replied, ''Are you afraid of
me?'' pushed Brooks with his left hand, stepped back himself,
drew his pistol, and immediately began to fire.  Over certain
features of the encounter the evidence leaves little doubt.
Brooks did arise and face the defendant with one or both
hands in his pocket, and either before the defendant drew his
pistol (as the defendant testifies) or after he drew his pistol
and fired the first shot (as the witnesses for the people tes-
tify), Brooks did spring upon the defendant, hurled him to
the ground and fought him on the floor, the defendant being
underneath.

This is a sufficient *résumé* of the evidence for the purposes of the consideration to follow. The court, after its instructions concerning the nature and elements of the crimes of murder in the first and second degrees, defined manslaughter to the jury correctly in the terms and language of the Penal Code, saying that "Voluntary manslaughter is the unlawful killing of a human being without malice, upon a sudden quarrel or heat of passion." (Pen. Code, sec. 192.) It then gave a further instruction to the jury in the following language: "I instruct you that in the case of a voluntary killing of a human being, without lawful excuse or justification, in order to reduce the killing from murder to manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. The killing must be the result of the sudden, violent impulse of passion, supposed to be irresistible, for, if there should appear to have been an interval between the assault, or a provocation given, and the killing, sufficient for the voice of reason and humanity to be heard, the killing must be attributed to deliberate revenge, and should be punished as murder."

And again: "To reduce the killing from murder to manslaughter, you must find from the evidence that such killing was the result of a sudden, violent impulse of passion on the part of the defendant, caused by some immediate serious or highly provoking injury inflicted, or attempted to be inflicted, on the person or reputation of the defendant, and which injury was sufficient, in your minds, to excite an irresistible passion in a reasonable person, and the interval of time, if any, between the provocation and the killing, if any, was not sufficient for the defendant's passion to cool and the voice of reason and humanity within him to be heard."

These instructions are almost literally a transcript of section 23 of the Crimes and Punishment Act of 1850 (Stats. 1850, p. 229 [231]). But that section ceased to be the law by failure to re-enact it in the Penal Code (*People* v. *Salvador*, 71 Cal. 16, [11 Pac. 801]).

In the present condition of our law it is left to the jurors to say whether or not the facts and circumstances in evidence are sufficient to lead them to believe that the defendant did, or to create a reasonable doubt in their minds as to whether

or not he did, commit his offense. under a heat of passion. The jury is further to be admonished and advised by the court that this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and that, consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man. Thus, no man of extremely violent passion could so justify or excuse himself if the exciting cause be not adequate, nor could an excessively cowardly man justify himself unless the circumstances were such as to arouse the fears of the ordinarily courageous man. Still further, while the conduct of the defendant is to be measured by that of the ordinarily reasonable man placed in identical circumstances, the jury is properly to be told that the exciting cause must be such as would naturally tend to arouse the passion of the ordinarily reasonable man. But as to the nature of the passion itself, our law leaves that to the jury, under these proper admonitions from the court. For the fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. (*Maher* v. *People,* 10 Mich. 217, [81 Am. Dec. 781].) Thus the sight of a wife in adultery, or even a reasonable belief that his wife was committing an act of adultery, although the belief may be unfounded, has been held sufficient evidence to go to the jury as creating "the heat of passion" in the mind of the defendant. (*State* v. *Yanz,* 74 Conn. 177, [92 Am. St. Rep. 205, 54 L. R. A. 780, 50 Atl. 37].) And this heat of passion may result from terror as well as anger or jealousy. (*Stevenson* v. *United States,* 162 U. S. 313, [40 L. Ed. 980, 16 Sup. Ct. Rep. 839] ; *Wiley* v. *State* (Tex. Cr.), 65 S. W. 190.) It may arise from the slayer's father-in-law attempting to take from him his wife and children. (*Cole* v. *State,* 45 Tex. Cr. 225, [75 S. W. 527].) These cases serve to illustrate that it is not alone the fear of great bodily injury which will reduce a homicide to the grade

of manslaughter. The passion aroused may be one entirely disconnected with any fear of personal injury, the fundamental inquiry being, we repeat, whether it be sufficient to obscure reason and render the average man liable to act rashly (*Mack* v. *State*, 63 Ga. 693; *Flannagan* v. *State*, 46 Ala. 703). The next proposition for the jury's determination is whether the existence of the provocative cause arousing passion being shown, the defendant in fact did act under it. It remains but to add that in this state the question has received due consideration in the cases of *People* v. *Bruggy*, 93 Cal. 476, [29 Pac. 26], and *People* v. *Jones*, 160 Cal. 358, [117 Pac. 176].

Indisputably, then, the instruction which was given was erroneous under our existing law. The only remaining consideration is whether or not it was injurious to defendant. But upon this suffice it to say that, having in mind the facts as above outlined, the feelings naturally engendered in defendant's mind by the indignity previously put upon him, the physical superiority of the deceased, the aggressive manner in which he accosted him, the fear that he was about to be subjected to a second humiliating beating, there was at least some evidence tending to reduce the crime from murder to manslaughter, for the due consideration of which evidence defendant was of right entitled that the jury should be correctly instructed. For, as well said in *Stevenson* v. *United States*, 162 U. S. 313, [40 L. Ed. 980, 16 Sup. Ct. Rep. 839]: "The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder and not manslaughter, or an act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court."

The judgment and order appealed from are therefore reversed.

Sloss, J., Shaw, J., and Melvin, J., concurred.